OPINION
Justice.
I. INTRODUCTION
Alaska's medical emancipation statute historically allowed minors to consent to pregnancy-related health care subject to an express exception for pregnancy termination. In 2001 we held that under the Alaska Con *1128 stitution's broad privacy guarantee a pregnant minor has the same fundamental privacy right to reproductive choice as an adult, and in 2007 we held that right cannot be conditioned on another's consent. The 2007 ruling allowed minors to obtain all pregnaan-cy-related health care-including pregnancy termination-without parental consent.
But in that 2007 ruling we recognized that the State of Alaska has compelling interests in aiding parents to help their minor children make informed and mature pregnancy-related decisions, and we indicated that a parental notification law might be implemented without unduly interfering with minors' fundamental privacy rights. The 2010 voter-enacted Parental Notification Law-generally requiring 48-hour advance parental notice before a physician may terminate a minor's pregnancy-revived the exception in the existing medical emancipation statute, creating considerable tension between a minor's fundamental privacy right to reproductive choice and how the State may advance its compelling interests.
In this case we must decide whether the Notification Law violates the Alaska Constitution, and we are presented with two specific and distinctly different questions: (1) Does the Notification Law violate the Alaska Constitution's equal protection guarantee by unjustifiably burdening the fundamental privacy rights only of minors seeking pregnancy termination, rather than applying equally to all pregnant minors? (2) If the Notification Law does not violate the Alaska Constitution's equal protection guarantee, does it violate the Alaska Constitution's privacy guarantee by unjustifiably infringing on the fundamental privacy rights of minors seeking to terminate a pregnancy?
We conclude that the Notification Law violates the Alaska Constitution's equal protection guarantee and cannot be enforced. But the decision we reach today is narrow in light of the limited State interests offered to justify the Notification Law. The State expressly disclaims any interest in how a minor exercises her fundamental privacy right of reproductive choice, and it does not suggest that it. has an interest in limiting abortions generally or with respect to minors specifically. And as a court we are not concerned with whether abortion is right, wrong, moral, or immoral, or with whether abortions should be available to minors without restriction. We are concerned only with whether, given its stated underlying justifications, the current Notification Law complies with the Alaska Constitution's equal protection guarantee-and it does not.
II, FACTS AND PROCEEDINGS
A. Early Statutory Backdrop
In 1968 the legislature enacted a medical emancipation statute allowing a physician to "examine a female minor over the age of 15 years with regard to pregnancy" without parental consent.[1] But at that time a carry-over territorial eriminal statute made abortion illegal "unless ... necessary to preserve the life of the mother," [2]
In 1970 the legislature rewrote the erimi-nal statute to allow certain abortions by licensed physicians in approved medical facilities.[3] But a portion of the criminal statute, AS 11,15.060(a)(8), expressly required parental consent before "an unmarried woman less than 18 years of age" legally could obtain an abortion.[4] In 1974 the legislature rewrote the medical emancipation statute to more broadly cover pregnancy-related medical care-except abortion-by stating that subject to AS 11.15.060(a)(8) "a minor may give consent for diagnosis, prevention or treatment of pregnancy," [5]
In 1976, presumably in reaction to then-recent United States Supreme Court decisions, the Alaska Attorney General issued an *1129 informal opinion on the validity of portions of AS 11.15.060.[6] The Attorney General concluded that the parental consent provision was a "clearly unconstitutional" infringement of minors' fundamental privacy rights under the United States Constitution because it was a blanket ban-regardless of a minor's actual capacity or maturity-and it applied even when an abortion might be necessary to save a minor's life.[7]
In 1980 the legislature removed AS 11.15.060 from the eriminal statutes and renumbered it as AS 18.16.010, but did not respond to the Attorney General's 1976 opinion that the parental consent provision violated the United States Constitution.[8] The parental consent provision remained in place as AS 18.16.010(2)(8) until amended with the enactment of the 1997 Parental Consent Act.[9] The relevant provision of the medical emancipation statute has not changed-other than replacing the exception's original reference to AS 11.15.060(a)(8) with a reference to AS 18.16.011(a)(8)[10]-although it was renumbered in 1994.[11]
B. Early Constitutional Backdrop
In 1972 voters added the following provision to the Alaska Constitution: "The right of the people to privacy is recognized and shall not be infringed."[12] In 1997 we examined this express privacy provision in the context of pregnancy-related decisions and held that a woman's fundamental privacy right to reproductive choice is more broadly protected by the Alaska Constitution than the United States Constitution.[13] And 15 years ago, in the constitutional equal protection context, we noted that "political disapproval" alone eannot justify treating women differently based upon how they exercise their reproductive choices.[14]
C. The 1997 Parental Consent Act
Shortly before our 1997 decision regarding a woman's broad fundamental privacy right to reproductive choice under the Alaska Constitution, the legislature enacted the Parental Consent Act.[15] The Consent Act amended AS 18.16.010(a)(@8) to generally require parental consent before a minor under age 17 could terminate a pregnancy and added other provisions addressing the federal constitution privacy concerns the Supreme Court and the Alaska Attorney General raised in the mid-197083.[16] The Consent Act's constitutionality soon was challenged.[17] The superior court enjoined the State from enforcing the Consent Act, summarily concluding that it violated the Alaska Constitution's equal protection guarantee.[18] The State appealed, and in Planned Parenthood I we remanded for a full trial.[19] But we acknowledged that under the Alaska Constitution pregnant minors have the same fundamental privacy right to reproductive choice as pregnant adults:
*1130 The "uniquely. personal" physical, psychological,. and économic implications of the abortion decision that we described in Valley Hospital are in no way peculiar to adult women, Deciding whether to terminate a pregnancy is at least as difficult, and the consequences of such decisions are at least as profound, for minors as for adults . . , . [20]
After trial the superior court concluded that the Consent Act violated both the privacy and equal protection guarantees of the Alaska Constitution, and again enjoined the State from enforcing the Consent Act.[21] The State appealed, and in Planned Parenthood IJ we held that although the State had shown compelling interests "in protecting minors from their own immaturity" and in "aiding parents to fulfill their parental responsibilities," the Consent Act was not the least restrictive means of furthering those interests.[22] We explained that requiring parental notification before terminating a minor's pregnancy could effectively meet the State's interests while imposing a lower burden on the minor's constitutional privacy right.[23] Because we concluded that the Consent Act was an unconstitutional infringement on fundamental privacy rights,[24] effectively ruling that all pregnant minors-not just those seeking to carry to term-were covered equally by the medical emancipation statute, we had no reason to address the equal protection question arising from the Consent Act,[25].
D. The Parental Notification Law
After our Planned Parenthood IIdecision, Loren Leman, Mia Costello, and Kim Hummer-Minnery (the Sponsors) sponsored a parental notification voter initiative.[26] In August 2010 voters approved the initiative, titled the Parental Notification Law,[27] constructed by amending the existing but unenforceable Consent Act,[28] A parental notification component was placed in AS 18.16.010(2a)(3),[29] thus reviving the medical emancipation statute's differential treatmenit of pregnant minors based on how they exercised their fundamental pmvaey right of reproductive choice.[30]
The Notification Law applies to unemaneci-pated, unmarried minors under age 18 seeking to terminate a pregnancy.[31] It includes specific requirements for parental notification,[32] a 48-hour mandatory waiting period *1131 between parental 'notification and the termination of a minor's pregnancy (absent a parent's earlier written consent),[33] and criminal and civil penalties for any physician who terminates a minor's pregnancy without complying with the notification requirements.[34]
The Notification Law includes an exception for certain medical emergencies.[35] It also includes two provisions for bypassing parental notification.[36] First, with the assistance of a court-appointed attorney,[37] a minor may seek a judge's permission to bypass the notification requirement.[38] Permission will be granted if the minor proves by clear and convine-ing evidence[39] that she is mature enough to make the decision without parental notice or consent or that her parents are abusive.[40] Second, an abused minor may bypass the notification requirement by providing to her physician notarized statements from herself and a witness regarding the abuse.[41] If an abused minor pursues this option, then the physician must report the abuse to the Alaska 'Department of Health and Social Services.[42]
E. This Case
Planned Parenthood of the Great Northwest and two doctors who perform abortions in Alaska (collectively Planned Parenthood) sought to enjoin enforcement of the Notification Law on the grounds that it violates the Alaska Constitution's privacy and equal protection guarantees. The Sponsors intervened to defend the Notification Law. The superior court denied a requested preliminary injune *1132 tion against the law as a whole, although it preliminarily enjoined several "peripheral features": eriminal punishment and civil liability for physicians; the requirement that only the physician-not an assistant-notify parents; the requirement that parents show government-issued identification during in-person notification to document that they are the minor's parents; and the clear and convincing evidence standard for the Juchlal bypass procedure. i
After trial the superior court made broad findings of fact on a number of issues, including how the Notification Law had functioned for the 14 months between its effective date and the trial. The court rejected Planned Parenthood's argument that the Notification Law violates equal protection by treating pregnant minors seeking termination differently from those seeking to carry to term. The court stated that Alaska's medical emancipation statute encourages pregnant minors to seek medical care which they otherwise might avoid for fear of parental involvement, and then reasoned that "onee a minor elects an imminent abortion, the core rationale underpinning medical emancipation no longer applies to her; she no longer requires encouragement to see a doctor to protect her own health and that of her fetus." The court therefore concluded that minors seeking pregnancy termination are not similarly situated to minors seeking to carry to term, and that the Notification Law's effective disparate application of the medical emancipation statute "does not violate Alaska's equal protection clause."
The superior court also analyzed whether the Notification Law violates minors' constitutional privacy rights and concluded that parts of the law are constitutional but others are not, The court vacated its preliminary injunction against some provisions, including the criminal sanctions for physicians and the parental-documentation requirement; it issued a permanent injunction against others, including the imposition of civil liability on physicians, the requirement that physicians personally notify parents, and the clear and convincing evidence standard for judicial bypass of the notification requirement.
The superior court issued a final judgment, and the clerk of court then awarded the State and the Sponsors their trial costs. The superior court later vacated the cost awards, concluding that both sides were prevailing parties on a main issue in the case and that no cost awards should be made.
Planned Parenthood appeals the superior court's ruling upholding the majority of the Notification Law, arguing for reversal on both equal protection and privacy grounds. The State and the Sponsors appeal the court's decision to strike some of the Notification Law's provisions, arguing that those provisions do not violate minors' constitutional privacy rights; they also appeal the costs ruling.
III. STANDARD OF REVIEW
We apply our independent judgment to equal protection claims.[43] In an equal protection analysis we must identify and assess the nature and importance of the competing personal and governmental interests at stake, identify the relevant level of seruti-ny for governmental action, and assess the means chosen, to advance governmental interests.[44] These are questions of law to which we apply our independent judgment, adopting "the rule of law 'most persuasive in light of precedent, reason, and policy'[45] Underlying findings of fact are reviewed for clear error [46]
*1133 IV, DISCUSSION
We begin by noting that a challenge to a statute "must overcome a presumption of constitutionality." [47] When a stat ute's constitutionality is facially challenged, we will uphold the statute even if it might occasionally create constitutional problems in its application, as long as it "has a plainly legitimate sweep." [48] But a statute infringing on a constitutionally protected right deserves close attention.[49] And our duty to uphold the Alaska Constitution is paramount; it takes precedence over the politics of the day and our own personal preferences.[50]
Finally, relevant to today's issues, our opening statement in Planned Parenthood II bears repeating:
From time to time, we are called upon to decide constitutional cases that touch upon the most contentious moral, ethical, and political issues of our day. In deciding such cases, we are ever mindful of the unique role we play in our democratic system of government. We are not legislators, policy makers, or pundits charged with making law or assessing the wisdom of legislative enactments. We are not philosophers, ethi-cists, or theologians, and "cannot aspire to answer" fundamental moral questions or resolve societal debates. We are focused only on upholding the constitution and laws of the State of Alaska, [51]
A. Equal Protection
1, Planned Parenthood II's non-effect on the challenge
The State, the dissent-and to a lesser degree the concurring opinion-assert that our Planned Parenthood II decision forecloses an equal protection challenge to the Notification Law; the State argues that "[when this Court held in Planned Parenthood II that a parental notification law was a constitutional option that was less restrictive than the parental consent law, by implication it also rejected [the current] equal protection challenge." We disagree.
In Planned Parenthood II we held that the Consent Act was an unconstitutional infringement on pregnant minors' constitutional privacy rights because a notification statute potentially could be 'a less restrictive alternative furthering the State's compelling *1134 interests.[52] Although in that decision’s introduction we'made the broad conclusory statement that “the constitution permits a statutory scheme which ensures -that parents are notified so that they can be engaged in their daughters’ important decisions in [pregnancy-related] matters,”[53] our holding addressed only the fundamental right to privacy.[54] We explained that “although parental notification statutes undoubtedly burden the •privacy rights of minors,” they would present potentially less restrictive alternatives than consent laws under a fundamental privacy right analysis.[55] We did not address other constitutional issues which might arise from a notification law—indeed, a notification law was merely hypothetical at that point.[56] And because our privacy ruling involving the consent law effectively placed all pregnant minors on an equal plane under the medical emancipation statute, we did not address the equal protection challenge to the Consent Act.[57]
The dissent and the concurring opinion unreasonably conclude we suggested that any parental notification law would pass constitutional- equal protection muster—sight unseen and without regard to either its stated justification or the factual underpinning for that justification—even though we engaged in no equal protection analysis whatsoever regarding parental notification laws. Our actual conclusion that a parental notification law might, survive a constitutional privacy challenge does not mean that every conceivable notification law,will do so.[58] Nor does it, mean that every conceivable notification law will satisfy the separate and independent constitutional equal protection standard. In the. fundamental rights context there is a significant difference between Alaska’s privacy and equal protection guarantees: The privacy clause guarantees that the State may not infringe upon an individual’s fundamental right of personal autonomy unless a compelling governmental interest justifies the infringement; in contrast the equal protection clause guarantees -that the State may not discriminate between individuals with respect to a fundamental right unless a compelling governmental interest justifies the discrimination.[59]
The dissent and the concurring opinion also fail to recognize governing precedent from Sands ex rel. Sands v. Green,[60] involving a constitutional challenge to 1-997’s reformed statute of limitations tolling provision.[61] Earlier, in Evans ex rel. Kutch v. State,[62] the four-pei'son court had addressed whether the new provision passed constitutional equal protection muster, and three justices concluded that it. did.[63] In Sands the same statutory provision was challenged on *1135 the different constitutional ground that it violated minors’ due process rights of access to the court.[64] We rejected the argument— essentially the saíne argument raised here by the dissent and the concurring opinion—that the first decision implicitly controlled the result in the second:
In Evans, we assessed the constitutionality of subsection- .140(c) only within the context of equal protection. We did not address the issue that we address today: whether subsection .140(c) violates a minor’s due process right to access the court system. We are similarly unpersuaded by the State’s argument that we were “aware of the ramifications of [our Evans] decision” because “Justice Carpeneti pointedly discussed those ramifications in a detailed dissent.” While the dissent in Evans did indeed discuss the ramifications of subsection .140(e) and argue that those ramifications constitute a denial of equal protection, it—like the lead opinion—did not consider the specific issue of due process.
That our Evans decision did not reach this particular constitutional issue merely reinforces the wisdom of the rule that courts should generally avoid deciding abstract cases,[65]
In Planned Parenthood II we answered the question whether the then-existing parental consent law violated minors’ constitutional privacy rights,[66] and declined to answer the question whether the then-existing parental consent law violated minors’ constitutional equal protection rights.[67] Here we face the new and very different question whether the current parental notification law ■violates minors’ constitutional equal protection rights. Suggesting that we somehow answered a question that was not actually asked in Planned Parenthood II is both incorrect and contrary to precedent. In every case we decide what we decide, and nothirig more.
In short, the Notification Law stands or falls on its own specific terins and stated justifications. ” ' •
2. The equal protection analysis—overview
The Alaska Constitution’s equal protection guarantee requires “equal treatment of those similarly situated.”[68] As we have previously explained in the context of a law treating two groups differently:
- When equal protection -claims are raised, the question is whether two groups of people who are treated differently are similarly situated and therefore are entitled to equal treatment under the constitution. In order to determine whether differently ■treated groups are similarly situated, we look to the state’s reasons for treating the groups differently. As a matter of nomenclature we refer to that portion of a law that treats two groups differently' as a “classification.”[69]
To determine whether the Notification Law discriminates between similarly situated classes, we first- decide which classes must be compared.[70] The parties- agree that the relevant classes are pregnant minors seeking termination and pregnant, minors seeking to carry to term. We next determine if the challenged law has a discriminatory purpose or is facially discriminatory—i.e., whether the classes are treated unequally.[71] *1136 It is clear that the Notification Law treats the two classes of pregnant minors differently, burdening the fundamental privacy rights of those seeking termination but not the fundamental privacy rights of those seeking to carry to term.[72] So when we examine whether these classes are similarly situated, we are asking a legal question: Under the applicable scrutiny level, do the stated rationales for the Notification Law justify discriminating between pregnant minors who choose to terminate a pregnancy and those who choose to carry to term? [73]
The State agrees with the foregoing legal framework. The Sponsors, however, cite Alaska Inter-Tribal Council v. State [74] for a different line of equal protection cases and argue that whether two classes are similarly situated is a threshold matter to be decided before considering whether there are valid reasons for treating them differently and that "similarly situated" is a question of fact reviewed for clear error.
Alaska Inter-Tribal Council did not involve an equal protection challenge to a statute classifying two groups of people, but rather to an alleged geographically discriminatory policy of police resource allocation in Alaska.[75] In that context, citing a federal case, we stated that whether persons, groups, or entities "are similarly situated is generally a question of fact."[76] The federal case we relied upon similarly did not involve an equal protection challenge to a statute classifying two groups of people, but rather to an alleged selective enforcement of a zoning ordinance, Le., discrimination against a "class of one." [77] Alaska Inter-Tribal Council did not purport to overrule the stated framework when considering statutory enactments, used as early as 1994 in Gonzales v. Safeway Stores, Inc.[78] and then as recently as 2008 in Stanek v. Kenai Peninsula Borough,[79] and used again not long after Alaska Inter-Tribal Council in Public Employees Retirement System v. Gallant.[80]
We separately noted in Alaska Inter-Tribal Council that there are some occasions when a full equal protection analysis may not be necessary because it is so exceedingly clear that the two classes in question are not similarly situated.[81] When com *1137 bined with our statement that whether two classes are similarly situated is "generally" a question of fact, we may have created some ambiguity about the standard of review for "similarly situated" when examining an equal protection challenge under the "shorthand analysis"-is it a question of fact or is it a mixed question of fact and law? Although we presently perceive no reason there would be a different underpinning for a shorthand analysis and a full analysis of an equal protection challenge to a statute classifying two groups of people, we do not need to address that question here,.
The superior court stated that our equal protection analysis applied to the extent the Notification Law "treats minors opting to carry to term differently from minors opting to abort." The court applied its fact-finding about pregnancies and abortions and their interplay with the Notification Law's stated justifications to conclude-not with a shorthand analysis, not as a purported finding of fact, but rather as a matter of law-that:onee a minor élected to undergo an abortion the justifications for medical emancipation did not apply and the justifications for parental involvement applied more heavily, so that she no longer was similarly situated with a minor electing to carry to term. We will review that legal conclusion under the framework outlined above and detailed more fully below.
8. Core equal protection analysis
Our core equal protection analysis applies a flexible three-step sliding-scale: First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the chal-
First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. ... Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation. _
Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show. only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.
Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Onee again, the state's burden will differ in accordance with the determination of the level of serutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is constitutionally adequate. At the higher end of the seale, the fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated. [82]
a. Step one
Step one of our core equal protection analysis requires evaluating the importance of the personal right infringed upon to determine the State's burden in justifying its differential infringement. It has long been established that the Alaska Constitution's privacy clause guarantees the fundamental right to choose between pregnancy termination and carrying to term.[83] And it has *1138 long been established that a law burdening the fundamental right of reproductive choice demands strict serutiny,[84]
Whether the Notification Law survives strict serutiny "depends on whether the [law] is narrowly tailored and whether there is a less restrictive alternative to meet the [State's] interest." [85] For the ' Notification Law "[tlo be narrowly tailored, there must be a sufficient nexus between the stated government interest and the classification created by the [aw]." [86] This nexus must riot be too under- or over-inclusive; as we have explained: As the level of serutiny selected is higher on the [sliding] seale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly
As the level of serutiny selected is higher on the [sliding] seale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed seruti-ny is indicated, less important governmental objectives will suffice and a greater degree of over/or underinelusiveness in the means-to-ends fit Wdl be tolerated.[87]
b. Step two
Step two of our core equal protection analysis requires identifying and assessing the State's interests in differently burdening pregnant minors' fundamental privacy rights. To justify differently burdening fundamental privacy rights, the State's interests in doing so must be compelling.[88] The State asserts two main interests as justifying the Notification Law's disparate treatment of pregnant minors: (1) "aiding parents to fulfill their parental responsibilities" and (2) "protecting minors from their immaturity." [89]
*1139 We accept that the State asserts compelling interests: In Planned Parenthood II we said that "the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnan-ey." [90] And we later stated that "on the most generalized level," the State has a compelling interest in "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities." [91] But we note that the interest in “protecting minors from their immaturity" requires context-immaturity in and of itself is not a harm. As we stated in Planned Parenthood II, "minors often do not possess the capacity to make informed, mature decisions, and are therefore susceptible to a host of pitfalls and dangers wnlmown in adult life." [92] The State's interest in "protecting minors from their immaturity" is in protecting minors from specific pitfalls and dangers to which their immatu: rity makes them especially susceptible. We therefore will consider the State's interest in "protecting minors from their immaturity" in the contexts of relevant stated harms: risks to mental and physical health and from sexual abuse,[93]
c. Step three
Having determmed that the Notification Law (1) burdens a class of pregnant minors' fundamental privacy rights and (2) was motivated by compelling state interests, we now examine, under strict serutiny, whether vindicating the State's compelling interests justifies imposing disparate burdens on the two groups of pregnant minorg' fundamental privacy rights. To survive strict serutiny the Notification Law's disparate treatment of the two classes "must further a compelling state interest and be the least restrictive means available to accomplish the state's purpose." [94] If -the means-to-end fit between the State's purpose and the Notification Law is not close enough-if the Notification Law is under-inclusive or over-inclusive-then it will not survive strict serutiny.[95]
i. Parental involvement[96]
We conclude that vindicating the State's compelling interest in encouraging parental involvement in minors' pregnancy related decisions does not support the Notification Law's disparate treatment of the two classes of pregnant minors. Parents do have an "important 'guiding role' to play in the upbringing of their children." [97] We have said that "it is the right and duty, privilege and burden, of all parents to involve themselves in their children's lives; to provide their children with emotional, physical, and material support; and to instill in their children *1140 'moral standards, religious beliefs, and elements of good citizenship'""[98] But as the State acknowledged at oral argument, this must be true for all pregnant minors parents, not just those whose daughters are considering termination.
No one challenges the superior court's factual finding that "[flew life decisions could benefit more from consultation with supportive parents than a minor's decision to carry to term; the decision to abort, comparatively, involves far fewer enduring consequences." All pregnant minors, not just those seeking termination, may need their parents' assistance and counsel when making reproductive choices; and parents who might counsel termination are as "entitled to the support of laws designed to aid [in thel discharge of [their] responsibility"[99] to guide their children as are parents who might counsel carrying to term."[100] Yet the Notification Law's effect is that only a minor seeking termination obtains parental guidance and only the parents of a minor seeking termination are given an opportunity to counsel their daughter about alternatives. But absent a compelling interest in limiting minors' pregnancy terminations and favoring their carrying to term-which the State does not assert-the State's compelling interest in fostering parental involvement extends equally to all pregnant minors and that interest's vindication does not justify treating the classes differently.
The State and the Sponsors contend that even if the importance of the State's asserted interest in parental involvement is equal for both classes, disparate treatment is justified because the State's interests eventually will be furthered for minors seeking to carry to term without parental notification, while furthering these interests for minors seeking termination requires parental notification. They contend that parents of a minor seeking to carry to term inevitably will learn of the pregnancy and then can further the asserted governmental interests by counseling and assisting the minor. They also contend that because an abortion can be kept secret, absent notification parents may not learn of it in time to provide counseling and assistance .[101]
Based on its evaluation of testimony regarding policies of Alaska hospitals, surgical centers, and health care providers, the superior court found that in Alaska an abortion generally is unavailable after about 14 weeks' gestation. After that point the decision to carry to term becomes essentially irreversible, and the opportunity to exercise reproductive choice is lost.[102] Trial testimony also *1141 reflected that it is possible for a pregnancy to be kept secret well past 14 weeks' gestation. Accordingly, parents learning of a minor's pregnancy after 14. weeks will have lost the opportunity to provide meaningful advice about reproductive choice; the State's interest in ensuring that parents have the opportunity to provide such advice thus is not necessarily furthered by the inevitability of the pregnancy becoming obvious.
ii. Minors' physical and mental health
The State asserts an interest in protecting minors' physical and mental health.. But, again, we conclude that this general interest alone cannot justify disparate treatment based upon a pregnant minor's decision to terminate or carry to term. The Sponsors more specifically argue that abortion entails unique medical risks not present when carrying to term, such as post-abortion complications, warranting parental involvement. But the superior court found that abortion raises fewer health concerns for minors than does giving birth, that abortion is "quintessentially" and "extraordinarily" safe, and that "the majority consensus of American psychiatry is that abortion does not cause mental illness." [103] The court noted that four doctors who had performed abortions in Alaska testified at the trial, and none indicated parental notification was medically helpful; the doe tors testified that minors are capable of providing their own medical histories and managing post-abortion care. The court also found that “[p]érental involvement is not required to manage complications, which are relatively rare and generally resolved by an obvious, immediate medical response." In short neither the Sponsors nor the State established that the medical risks of pregnancy. termination justify the Notification Law's disparate treatment of pregnant minors.
The State also contends that its interest in-protecting minorg' health is implicated differently when minors seek to carry to term because parental notification discourages pregnant minors from obtaining prenatal medical care. The State asserts that it thus has a more "limited" health interest in minors seeking termination which justifies treating them differently from those seeking to carry to term. But if the specter of parental notification would discourage pregnant minors from seeking timely medical care eon-sistent with their statutory and constitution ally protected fundamental privacy right to carry to term, then logically it also would discourage those seeking timely medical care consistent with their constitutionally protected fundamental privacy right to terminate. And because the superior court found that in Alaska an abortion generally is unavailable after about 14 weeks' gestation, time is of the essence. Absent a valid and compelling interest in discouraging termination and favoring 'carrying to term, an interest the State expressly denied at oral argument, we conclude that the State's interest in protecting the health of a minor seeking termination is *1142 equal to its interest in protecting the health of. a minor seeking to carry to term.[104]
'The concurring opinion echoes another State argument that "[plregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies do not face the same choice" because "the pregnant minor who seeks to carry her pregnancy to term does not strictly need medical treatment" while "[the pregnant minor who seeks to termi-pate her pregnancy ... cannot do so without medical treatment." [105] This arbitrary distinction is untethered to the State interests justifying the Notification Law and is inconsistent with the rationale for medical emancipation.
© Until actually seeking pregnancy-related medical care the only difference between a minor seeking to terminate a pregnancy and a minor seeking 'to carry to term is the constitutionally protected choice each is making.[106] But once both minors seek pregnancy-related medical care, the Notification Law allows the minor seeking to carry to term to immediately consent to and receive treatment while requiring parental notification before the minor seeking termination may consent to and receive treatment. The statutory mandate that abortions be performed by doe-tors does not eliminate the justification for medical emancipation-encouraging minors to seek timely legal medical care they otherwise might forgo or delay for fear of parental involvement [107]-and does not necessitate disparate treatment of the two groups.
iii. Sexual abuse prevention
We conclude that the State's interest in protecting minors from sexual abuse must be the same whether a pregnant minor seeks termination or seeks to carry to term. The superior court found that parental notification in and of itself would not meaningfully advance the State's interest in protecting minors from sexual abuse. And the State and the Sponsors point to no evidence that pregnant minors seeking termination are more likely to have been sexually abused-and therefore more in need of protection-than those seeking to carry to term. The Sponsors cite testimony that pregnant minors could be pressured by peers into seeking termination and speculate that the pressure could come 'from "those seeking] to hide ilegal sexual activity." But the Sponsors cite no evidence that pregnant minors seeking termination are more likely to have been involved in "Hegal sexual activity," are less likely or able to report sexual abuse, or are disproportionately more likely to have been pressured to seek termination-and therefore more in need of protection-than those. seeking to carry to term.[108] No facts before us demonstrate that vindicating the State's compelling interest in protecting minors from sexual abuse justifies requiring that parents of mi *1143 nors seeking termination be notified without requiring the same for parents of minors seeking to carry to term. And neither the dissent nor the concurring opinion expressly disputes this conclusion.
d. Conclusion
We must conclude that the State's asserted interests do not justify a distinction between pregnant minors seeking to terminate and those seeking to carry to term. Despite the factual difference between the two classes of pregnant minors, as a matter of law they are similarly situated with respect to the Notification Law. The Notification Law is under-inclusive because the governmental interests asserted in this case are implicated for all pregnant minors-as they face reproductive choices and as they live with their decisions-and the asserted justifications for disparate treatment based upon a minor's actual reproductive choice are unconvincing. The Notification Law's discriminatory barrier to those minors seeking to exercise their fundamental privacy right to terminate a pregnan-ey violates Alaska's equal protection guarantee.[109]
. Our decision today is not novel. Over 15 years ago the New Jersey Supreme Court considered whether a similar law violated that state's similar equal protection guarantee.[110] New Jersey's Constitution does not contain the explicit privacy guarantee that Alaska's Constitution does, but the court began its equal protection analysis by noting that New Jersey's Constitation-like Alaska's-"more 'expansivelly]" protects "the right of privacy and its. concomitant rights, including a woman's right to make certain fundamental choices," than does the United States. Constitution.[111] The court held that the parental notification law was subject to the "most exacting serutiny" and that it "significantly burden[ed the rights of] unemaneci-pated women seeking abortions." [112] The court reasoned that the law would create impediments preventing minors from exercising their constitutional rights, an unacceepta-ble outcome "without substantial adequate justification for the classification." [113]
The New Jersey court considered each of the asserted governmental interests raised here by the State and. the Sponsors-protecting minors from their own immaturity, fostering family communications, and protecting parents' rights to raise their children-and determined that mandatory parental notification of planned pregnancy terminations did not further those interests.[114] The court concluded that "the New Jergey Constitution *1144 does not permit the State to impose disparate and unjustifiable burdens on different classes of young women when fundamental constitutional rights hang in the balance." [115] The court also made the following prescient statement, with which we agree:
We emphasize that our decision in no way interferes with parents' protected interests, nor does it prevent pregnant minors or their physicians from notifying parents about a young woman's choice to terminate her pregnancy. Simply, the effect of declaring the notification statute unconstitutional is to maintain the State's neutrality in respect of a minor's child-bearing decisions and a parent's interest in those decisions. In effect, the State may not affirmatively tip the seale against the right to choose an abortion absent compelling reasons to do so.[116]
The dissent nonetheless contends we are out of the mainstream of judicial reasoning, pointing to other jurisdictions with either parental consent or parental notification laws in place. But this contention is unsupported by any serious judicial reasoning tied to the required equal protection analysis under the Alaska Constitution: Relevant inquiries about each jurisdiction's laws are conspicuously absent.
Does that jurisdiction have the same broad fundamental privacy right for a minor's reproductive choice as conferred by the Alaska Constitution? The answer obviously must be "no" for any jurisdiction with a parental consent law or any jurisdiction with privacy or liberty rights co-extensive with those of the United States Constitution. Does the jurisdiction have the same equal protection guarantee as conferred by the Alaska Constitution? And if it does: (1) what weight does that jurisdiction give to a minor's privacy interest; (2) what are the government's asserted interests and what weight does that jurisdiction give them; and (8) what level of scrutiny does the jurisdiction apply? If the jurisdiction does not afford minors the same fundamental privacy right to reproductive choice as Alaska, or if the jurisdiction asserts more compelling governmental interests in limiting minors' abortion rights than does Alaska, then the weighing of interests-even under our own equal protection framework-likely would render a different result.[117]
The bare assertion that some other jurisdictions have parental consent or notification laws conflates different constitutional interests and protections and lends nothing to the required equal protection analysis under the Alaska Constitution. For example, relying on Planned Parenthood of Southeastern Pennsylvania v. Casey,[118] the dissent asserts that the United States Supreme Court "has clearly explained" that a state may legitimately enact laws "designed to encourage a woman contemplating abortion to be informed regarding the effects that abortion may have on her and regarding alternatives to abortion." [119] The dissent therefore concludes that the State has a legitimate interest in the Notification Law that today's decision "trivializes." [120]
We do not disagree with the dissent's characterization of Casey. But Casey involved the balancing of a woman's liberty interest and a state interest in preserving unborn life under the United States Constitution.[121] In the case before us: (1) the fundamental right of priva *1145 cy and the right of equal protection under the Alaska Constitution are at issue;, (2) the State expressly disavowed any governmental interest in the ultimate reproductive choice made by pregnant minors, i.e., the State did not assert a compelling interest in preserving unborn life;[122] and (8) as discussed extensively above, the compelling State interests justifying the Notification Law do not include requiring pregnant minors to be informed of the "effects" of abortion or the alternatives to abortion, but rather include aiding parents to fulfill their parental responsibilities and protecting minors from risks to mental and physical health and from sexual abuse.[123] The parties did not cite Casey in their briefing, nor did they make the immaterial argument the dissent advances.
B. Privacy
Part II of the concurring opinion, to which three justices agree, concludes that a number of the Notification Law's provisions violate pregnant minors' constitutional privacy rights. But because the Notification Law cannot stand in the face of the Alaska Constitution's equal protection guarantee, it is unnecessary to decide-and it is not decided-whether invalidation of those provisions on the constitutional privacy ground renders the Notification Law unenforceable in its entirety.[124] We reiterate that our Planned Parenthood II conclusion indicating a parental notification law might satisfy Alaska's constitutional privacy standard does not necessarily mean that any particular parental notification law will do so. We also reiterate that today's equal protection decision is based on the limited State interests asserted to justify the Notification Law's discrimination against minors seeking to terminate a pregnancy, and that a similar law with different supporting justifications would require a new equal protection analysis.
C. Cross—Appeal '
In light of our ruling, we do not need to reach the issues raised in the State's and the Sponsors' cross-appeals.
v. CONCLUSION
The Parental Notification Law violates the Alaska Constitution's equal protection guarantee. We REVERSE the superior court's decision to the extent that it upholds the Parental Notification Law, and we REMAND for further proceedings, including entry of judgment consistent with our decision.
FABE, Chief Justice, concurring: . MAASSEN, Justice, and BOLGER, Justice, joining only in Part II of the concurrence.
I disagree with the court's analysis and conclusion that the Parental Notification Law violates the guarantee of equal protection. But because this parental notification scheme violates the fundamental right to privacy, I *1146 concur -with the court’s judgment, A law that burdens reproductive choice “must be subjected to strict scrutiny and can only survive review if it advances a compelling state interest using the least restrictive means of achieving that interest.”[1] This law does not achieve its goals using the least restrictive means; on the contrary, it is one of the most restrictive parental notification laws in; the country. I believe that the Alaska Constitution permits a parental notification law, but not one that contains provisions that are among .the most restrictive of any state’s notification laws. Thus, I agree -with the court that this law violates the Alaska Constitution.
I. RIGHT TO PRIVACY, RATHER THAN EQUAL PROTECTION, IS THE APPROPRIATE CONSTITUTIONAL FRAMEWORK FOR THIS LAW.
We have held “that reproductive rights are fundamental, and that they are encompassed within the right to privacy expressed in article I, section 22 of the Alaska Constitution.” [2] Since our first decision on this issue, we have most often analyzed challenges to laws that relate to a woman’s right to reproductive choice as matters of the constitutional right to privacy.[3] I continue to view the right to privacy as the appropriate lens through which to analyze such laws, including the parental notification statute at issue in this case.
When fundamental rights are at issue, our right-to-privacy analysis closely resembles our equal protection analysis. Both modes of analysis require identification of'a compelling governmental interest, advanced by the least restrictive means.[4] They differ in what aspect of a law is subjected to this strict review: its infringement of the fundamental right or its discriminatory treatment of the fundamental rights of two different groups. In my view the notification law infringes on a minor’s fundamental right to reproductive choice in a manner that is not the least restrictive means of accomplishing the government’s compelling interests, but it does hot treat similarly situated groups dissimilarly.
As we have recognized, the State has compelling interests in “protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities.”[5] The court concludes that the State’s interest in aiding parents in fulfilling their parental responsibilities does not require different treatment of pregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies.- I agree with the court’s legal framework for analyzing this question. But I believe that those groups are not similarly situated with regard to the State’s broad interest in protecting minors from their own immaturity.
“In order to determine whether differently treated groups are similarly situated, we look to the [S]tate’s reasons for treating the groups differently.” [6] The State’s reasons are *1147 discernable from the full context of Alaska's medical notification and consent laws for minors. Under Alaska law, minors generally cannot consent to medical care.[7] There is, however, an exception "for diagnosis, prevention or treatment of pregnancy, and for diagnosis. and treatment of venereal disease.[8] This exception encourages minors not to delay or forgo medical assistance that they might hesitate to discuss with their parents. The Parental Notification Law, then, is an exception to the exception: It requires pregnant minors seeking to terminate their pregnancies to notify their parents or seek a Judicial bypass before doing so.
Pregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies do not face the same choice about whether to seek medical assistance. Although she would surely be wise to visit a doctor, the pregnant minor who seeks to carry her pregnancy to term does not necessarily need medical treatment to achieve her aims, The pregnant minor who seeks to terminate her pregnancy, in contrast, cannot do so without medical treatment.[9] As the superior court noted, "once a minor elects an imminent abortion, the core rationale underpinning medical emancipation no longer applies to her; she no longer requires encouragement to see a doctor to protect her own health or that of her fetus." Instead, she must seek medical treatment, and the risk of delay or avoidance that animates the exception to the general parental consent requirement for "diagnosis, prevention or treatment of pregnancy, and for diagnosis and treatment of venereal disease" is qualitatively different.
The State may not discriminate between women in order to influence their reproductive choices.[10] And carrying a pregnancy to term may entail risks to a minor's physical and mental health that are equal to the corresponding risks from terminating a pregnancy. But pregnant minors geeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies face significantly different incentives to delay or avoid medical assistance and significantly different risks from that delay or avoidance. Thus, an equal protection analysis of the Parental Notification Law should not treat these groups as similarly situated.
Moreover, in Planned Parenthood II "we determine[d] that the constitution permits a statutory scheme which ensures that parents are notified so that they can be engaged in their daughters' important decisions" in matters related to pregnancy.[11] By holding up parental notification laws as a less restrictive alternative to the parental consent law then at issue, we indicated that at least some guch laws would pass constitutional muster.[12] But the court today calls that determination into question, In order to give similar treatment to minors seeking to carry to term and minors seeking to terminate their pregnancy- and thus to survive the court's equal protection analysis-a notification statute would have to require parental notice of all pregnancy-related. care. Yet none of the notification statutes we cited as alternatives in Planned Parenthood II require such universal notice for all pregnant minors, and thus they would likely fail under the court's equal protection analysis.[13] For these reasons, I *1148 respectfully disagree with the court's application of our equal protection doctrine here. Instead, I believe that the appropriate lens through which to analyze the parental notification law at issue in this case is the right to privacy, and I turn to that analysis next.
II. THE LAW VIOLATES THE RIGHT TO PRIVACY.
The right to privacy, enshrined in the Alaska Constitution,[14] protects the fundamental right to reproductive choice for minors as well as adults.[15] A law that burdens this interest "must be subjected to strict serutiny and can only survive review if it advances a compelling state interest using the least restrictive means of achieving that interest." [16]
In Planned Parenthood II we held that a parental consent law failed strict seru-tiny by prohibiting a pregnant minor from terminating her pregnancy without first obtaining the consent of her parents, unless she had been granted a judicial bypass.[17] That parental consent law was not the least restrictive means of achieving the State's interests because "(there exists a less burdensome and widely used means of actively involving parents in their minor children's abortion decisions: parental notification.[18] "* This does not mean, however, that any and all parental notification laws comport with strict serutiny; as we recognized, "parental notification statutes undoubtedly burden the privacy rights of minors." [19] These laws must still achieve their aims without any unnecessary burden on minors' privacy rights; that is, they must use the least restrictive means of achieving the State's compelling interests. The parental notification law at issue here does not achieve its goals using the least restrictive means: In fact, it is one of the most restrictive laws of its type in the country. The fact that other states achieve the same interests by significantly less restrictive means indicates that Alaska's Parental Notification Law is not narrowly tailored.
When undertaking a review of this statute as a whole, it becomes evident that the law's methods are not the least restrictive means available to advance the State's recognized compelling interests. First, the standard of proof for a court exemption from the notice requirement is clear and convine-ing evidence-the strictest standard of proof in the country for any such law. Although the superior court enjoined this aspect of the statute, the State and its co-appellants appeal that ruling, which requires us to address whether the standard of proof survives strict serutiny. The law recognizes three grounds for judicial bypass: (1) sufficient maturity; (2) physical, sexual, or repeated emotional abuse by the parent or guardian; and (8) that parental consent [20] is not in the minor's best interest.[21] Each of these must be proved by clear and convincing evidence.[22] Only three other notice states require a minor to prove her sufficient maturity by clear and convincing evidence;[23] only two require her to prove that notice would not be in her best interest by that standard.[24] And not one of *1149 the six states that provide for bypass on grounds of abuse (rather than folding evidence of abuse into the best interest inquiry) requires proof by clear and convincing evidence.[25]
-The standard of proof can have a real, significant impact on these cases: As observed in the child custody context, "in close cases, a higher standard of proof will place the risk of erroneous factfinding on the child." [26] Here, that risk is acute. The "clear and convincing" requirement in the Parental Notification Law would require that a trial court deny a judicial bypass to some minors even if it finds that they are likely (though not clearly and convincingly) sufficiently mature, or victims of abuse, or best served by a bypass. The high standard of proof yields a particularly stark outcome in the case of a minor who has been abused by a parent or guardian, where a trial judge would be required to deny judicial bypass for a pregnant minor who was likely abused by her own parent but cannot provide sufficient evidence to satisfy the clear and convineing standard.[27] It may be especially hard for a minor to meet this standard of proof in such familial abuse cases, where "a child's report of a parent's [abusive] conduct is often the primary source of evidence." [28] As in the child custody context where this issue has previously been discussed, "[elven if it is not debatable that the parent's actions are [abusive], the lack of corroboration-particularly in light of a parent's denial-may mean that the ehild's report, although providing a preponderance of the evidence, will fail to satisfy the clear and convincing standard."[29] In such a case, the trial court would be required to deny judicial bypass, Given the balance of rights and interests involved, this outcome can hardly be viewed as the least restrictive means of achieving a compelling: state interest. Thus the burden of proof for the. judicial bypass procedure fails strict serutiny. -
Second, the only other way for an abused minor to avoid the parental notification requirement is for the abuse to be documented in a notarized statement signed by a witness who has "personal knowledge of the abuse" and who is a law enforcement officer, a Health and Social Services investigator, or a grandparent, stepparent, or sibling over the age of 21.[30] Here again, the requirements of the law clash with the realities of a pregnant minor who has been abused by a parent yet must seek corroborating evidence from her own family or from a government official to prové it, Because much familial abuse is not susceptible' to outside witness, or may only be witnessed by another family member who is not willing to testify, in practice this option will likely be foreclosed to many of the young women it is designed to protect.[31] Re *1150 quiring a signed and notarized declaration from a witness, therefore, unduly restricts these minors' rights, Nor does the judicial bypass-even if it were not overly restrictive itself-cure the unreasonably restrictive nature of this provision. As we held in Planned Parenthood II, "the inclusion of [al] judicial bypass procédure does not reduce the restrictiveness" of the provision in question.[32] So for a daughter who was abused by a parent or guardian-perhaps the very person she is required to notify under this law-neither the judicial bypass nor the witnessed declaration provides a constitutionally adequate alternative to the law's parental notification requirement.
Third, the Parental Notification Law burdens physicians and all involved famﬂles by imposing verification requirements that have no analogue in the notification laws of other states. Most of the 11 states other than Alaska that have notification laws do not specify how the 1dent1ty of a notice, recipient is to be estabhshed and those that do simply require that the recipient produce government-issued identification [33] or that the physician record the number dialed and the date and time of the phone call.[34] In contrast, Alaska's Parental Notification Law imposes a burden that is not found in any other state's statute by requiring that any in-person notice recipient "show government-issued identification along with additional documentation of the person's relationship to the minor," [35] and that the physician delivering notice by phone "attempt[ ] to verify through a review of published telephone directories that the number to be dialed is that of the minor's parent, legal guardian, or custodian, and ask[ ] questions of the person to verify that the person's relationship to the minor is that of parent, legal guardian, or custodian." [36] As the superior court recognized, the additional documentation requirement for in-person notice "clashes 'with the realities of rural Alaska," These documentation requirements also mean that a doctor has not fulfilled the statute's notice requirement even after giving in-person notice to a parent who is fully aware of a daughter's decision to terminate her pregnancy but has misplaced her birth certificate. Furthermore, the law requires the physician 'to deliver notice himself or herself rather than permitting delegation of this responsibility to medical office staff.[37] This is a far more burdensome approach than that selected by other states, the vast majority of which statutorily allow someone other than the physician to deliver notice.[38] Thus, this parental notification scheme is not the least restrictive means of advancing the State's compelling interests.
Fourth, the statute's imposition of civil liability for all violations of the Parental Notification Law is more punitive and chilling than penalties in equivalent notification laws in other states, Again, although the superior court enjoined the operation of this portion of the statute, the State and its co-appellants argue that the injunction against it should be lifted. Of the five states that make physicians civilly Hable for failure to provide notice, two require that the physi *1151 cian's failure be "willful." [39] Only one of the remaining three discusses punitive damages, and then only to clarify that the statute does not specifically prohibit such damages.[40] In contrast, Alaska's Parental Notification Law explicitly allows punitive damages against physicians without requiring any finding of willfulness.[41] This is yet another way in which this statute is an outlier, at odds with our constitution's express recognition of the fundamental right to privacy and its requirement that any burden on that right must be the least restrictive means of achieving a compelling government interest.
Fifth, I cannot conclude that the specter of a felony conviction and five years imprisonment for any person who knowingly violates the notice requirement[42] is narrowly tailored to advance a compelling state interest. Four notification states have no criminal penalty attached to their notification laws.[43] Another six make violation a misdemeanor.[44] Only one makes it a felony, and even there a violation of the notice requirement is the lowest class of felony, with a maximum of two years imprisonment,[45] The Parental Notification Law's eriminal penalty is by far the most severe of any state, demonstrating that it is not the least restrictive means of enforeing a notification law. And although the Parental Notification Law fails the least-restrictive-means analysis even without reference to its eriminal penalties, these penalties are a further indication that the law's provisions are not narrowly tailored.
Furthermore, the law as originally adopted contained still more elements that fail the least-restrictive-means test. For example, the law as enacted allowed constructive notice to be mailed only after 24 hours of failed attempts at telephonic notice, and it applied even when medical conditions rendered fetal death inevitable.[46] These aspects of the law further demonstrate that the statutory scheme as designed was one of the most restrictive and burdensome in the coun-
And not only does this law achieve its aims by overly restrictive methods, it also adopts an overly expansive scope by sweep ing in minors whose maturity in reproductive choices the legislature has formerly recognized. The parental consent act we considered in Planned Parenthood II applied only to minors 16 and younger.[47] Both the court and the dissent in that case noted that this represented "a serious effort to narrowly tailor the seope of the [Parental Consent Act]" [48] by excluding "the population of teenage girls most likely competent, by virtue of maturity and experience, to make the decision regarding abortion without adult assistance." [49] The notification law at issue in this appeal does not demonstrate a serious effort at narrow tailoring. Indeed,; while a 17-year-old living independently from her parents may make her own, uninfluenced decisions *1152 about all other medical questions,[50] the Parental Notification Law would not allow her the same independence with regard to her reproductive choice,[51] a decision protected by her fundamental right to privacy. The fact that the law reaches the minors least likely to need protection from their own immaturity again indicates that its seope is not narrowly tailored. Although this list of the ways that the law's methods infringe on a minor's constitutional right to privacy is not meant to be exhaustive, it is more than adequate to establish that the Parental Notification Law cannot stand.
III. THE UNCONSTITUTIONAL PROVISIONS ARE NOT SEVERABLE.
The law's provisions that violate the right to privacy affect virtually every aspect of the notification process. From the notification mechanism, to the law's seope, to its civil and criminal penalties, to the judicial bypass procedure, and even to the provision excusing notice in the case of an abused minor, these constitutionally intrusive provisions reach the point where "their invalidation so undermines the structure of the Act as a whole that the entire Act must fall." [52] Our sever-ability doctrine rests on the test set out in Lynden Transport, which "asks (1) whether 'legal effect can be given' to the severed statute and (2) if 'the legislature intended the provision to stand' in the event other provisions were struck down."[53] We later explained that "Lynden Transport is the test for severability of enacted measures, whatever their source"-including for laws adopted by a ballot measure, like the Parental Notification Law.[54] I believe that the remaining, constitutionally valid portions of the Parental Notification Law would not satisfy this test,
The "legislative intent" prong of our sever-ability test incorporates the widely accepted principle that "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.' "[55] In assessing legislative intent, our recent cases have considered whether the act in question contained a severability clause, reading such a clause as the primary "indicat[ion] that the legislature intended the remainder of the Act to stand if part of it were invalidated." [56] In both Alaskans for a Common Language v. Kritz and State v. Alaska Civil Liberties Union, the presence of a severability clause was central to our conclusion that the remaining portions of the acts could stand alone after severing the constitutionally invalid portions. Other state high courts and the U.S. Supreme Court have taken a similar approach to severability clauses, generally removing only the challenged portions if a severability clause exists but striking the entire law in the absence of such a clause.[57]
*1153 The Parental Notification Law did not contain a severability clause, The omission of a severability clause is particularly illuminating here, given that the initiative's sponsors had reason to know, based on this law's history,[58] that the enacted law might face a challenge on constitutional grounds. I do not suggest that a severability clause is dispositive: Indeed, the presence of a severability clause does not necessarily mean that a statute's constitutionally invalid provisions are severa-ble from the remainder of the statutory scheme.[59] But here the absence of a sever-ability clause weighs in favor of finding that the invalid portions of the law are not severa-ble and thus that the entire act must fall.
Moreover, we have held that a law will fail the legislative intent prong if the remainder of the law is not "independent and complete in itself" so that we may presume the remaining, valid portions were intended to stand on. their own in the event that the other portions were struck down.[60] Here, the constitutional infirmities described above are pervasive-they touch nearly every aspect of the Parental Notification Law. If the portions of the law that violate the right to privacy were removed, it would mean eliminating key elements of the notification requirement, the civil and criminal penalties for its violation, the judicial bypass procedure, and the alternative provision for documented abuse of the pregnant minor, The law cannot be considered "independent and complete in itself" [61] in the absence of all these provisions. Thus, under our prior case law, we cannot presume the remaining portions were intended to stand on their own, The law therefore fails the legislative intent prong of the Lynden test.
Next, although the failure of one Lynden prong is sufficient to conclude that the invalid portions cannot be gevered, in this case the statute likely fails the "legal effect" prong of the test as well. Specifically, I have serious doubt that "legal effect can be given" [62] to this law once critical aspects of virtually all the core provisions are found unconstitutional. As other courts engaging in similar severability analyses have noted, the challenged portions of a statute may "represent a vital part of the statutory scheme," such that altering or removing them "would create a program quite different from the one the people actually adopted." [63] The Ninth Cireuit, for instance, has held that constitutionally flawed provisions of a law cannot be severed when doing so "would essentially eviscerate the statute." [64]
The Supreme Court of Colorado undertook a similar analysis in a recent case challenging an. amendment to the state constitution, which limited certain types of political campaign contributions, and which had been passed by voter initiative.[65] After striking the invalid provisions, the court explained, the entire law must fall "Hf what remains is so incomplete or riddled with omissions that it cannot be salvaged as a meaningful legislative enactment." [66] Emphasizing that a court "cannot rewrite or reshape a law in order to maintain its constitutionality," [67] the court ul-invalid provisions, the court explained, the entire law must fall "Hf what remains is so incomplete or riddled with omissions that it cannot be salvaged as a meaningful legislative enactment." [66] Emphasizing that a court "cannot rewrite or reshape a law in order to maintain its constitutionality," [67] the court ul *1154 timately explained that it was required to "strike the entire law" because "its purpose [was] so eviscerated by necessary nullifica-tions that the original law cannot stand in any working order." [68]
Similarly, the pervasive constitutional infirmities affect every core provision of the Parental Notification Law, The unconstitutional provisions: described 'above include elements of the procedure that a doctor must follow under the notification requirement, the age cutoff for the requirement, the civil and erim-inal penalties for violating it, the burden of proof for the judicial bypass-which applies to all three potential bypass options-and the requirements for the alternative process that an abused minor may use. In short, the constitutional infirmities touch all four pillars of the statutory framework under the "notice or consent" provision at issue in this case.[69] Without these pillars, the law cannot stand.
I therefore believe that the constitutionally impermissible provisions "represent a vital part of the statutory scheme" and that severing theim "would essentially eviscerate the statute." [70] Attempting to patch together a constitutional statute from the remaining portions of the law would effectively be an exercise 'in rewriting the law, Our own cases,[71] as well as similar approaches used by other courts,[72] caution against wholesale revision of statutory language in this manner. Nor can we simply modify the constitutionally problematic provisions as the dissent suggests,[73] because we must refrain from this "quintessentially legislative work" of "rewriting [the] law to conform it to constitutional requirements." "[74] Thus, at the point where we would be essentially rewriting every major provision of a statute, the entire statute instead must be struck down. Here, where the unconstitutional portions of the law affect every element of the statutory scheme, the law reaches the point where it is so riddled with constitutional holes that it cannot be salvaged.
Accordingly, because the Parental Notification Law fails both prongs of the Lynden test, I would conclude that the constitutionally invalid portions of the law are not severa-ble from the remaining provisions, and thus the entire law must fall, I therefore would hold that the Parental Notification Law im-permissibly violates a minor's fundamental right to privacy because it does not advance the compelling state interest by the least restrictive means, and I concur with the court's judgment that the law must be struck down as violating the Alaska Constitution,

. Ch. 204, § 1, SLA 1968; former AS 09.65.100 (1968).

. See former AS 11.15.060 (1962); § 65-4-6 Alaska Compiled Laws Annotated (1949).

. Ch 103, § 1, SLA 1970; 11,15.060(a)(1)-(2) (1970). former AS

. Former AS 11.15.060(a)(3) (1970).

. Ch. 73, § 1, SLA 1974; former AS 09.65.100(a)(4) (1974) renumbered as AS 25.20.025.

. 1976 InFormar Or, Art'v Gen, (Oct. 21).

. Id. at 3-6, 7.

. Ch. 166, § 22, SLA 1978 (effective Jan. 1, 1980). The statute later was reorganized. See AS 18.16.010 (1986).

. Ch. 14, §§ 2, 3, 6, SLA 1997.

, Ch. 166, § 22, SLA 1978 (effective Jan. 1, 1980).

. See AS 25.20.025(a)(4) (1994).

. Alaska Const. art. I, § 22; Valley Hosp. Ass'n v. Mat-Su Coal. for Choice, 948 P.2d 963, 968 (Alaska 1997).

. Valley Hosp. Ass'n, 948 P.2d at 966-69.

. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 905 (Alaska 2001) (stating that "political disapproval" does not justify denying Medicaid coverage to women seeking abortions when coverage is granted to women seeking to carry to term). See also Alaska Const. art. I, § 1 (providing that all persons are "entitled to equal rights, opportunities, and protection under the law").

. Ch. 14, §§ 1-10, SLA 1997; see also former AS 18.16.010(a)(3) (2004); former AS 18.16.020 (2004).

. Ch. 14, §§ 1-10, SLA 1997; of. Inrormar Or. Att'y Gen., supra note 6 at 3-6, 7.

. See State v. Planned Parenthood of Alaska (Planned Parenthood I), 35 P.3d 30, 32-33 (Alaska 2001).

. Id. at 33; see Alaska Const. art. I, § 1 (guaranteeing "equal rights, opportunities, and protection under the law").

, Planned Parenthood I, 35 P.3d at 46.

. Id. at 40 (footnote omitted), quoted with approval in State v. Planned Parenthood of Alaska (Planned Parenthood II), 171 P.3d 577, 582 & n. 26 (Alaska 2007).

. Planned Parenthood II, 171 P.3d at 580-81.

. Id. at 582-83, 585.

. Id. at 584-85.

. Id. at 583-86.

. See id. at 581 n. 21, 585 ("Because we conclude that the [Consent Act] violates the right to privacy under the Alaska Constitution, we need not address [whether] the Act also violates the equal protection clause. ..,").

. See Planned Parenthood of Alaska v. Campbell, 232 P.3d 725, 727 (Alaska 2010) (discussing the initiative's procedural history).

. AS 18.16.010-.040,

. Alaska Laws Initiative Meas, 2 (Bal, Meas. 2), 26th Leg., 2d Sess. (2010).

. AS 18.16.010(a)(3) generally provides that a physician may not perform an abortion for a "pregnant, unmarried, unemancipated woman under 18" absent advance parental notice or judicial authorization to proceed without parental involvement, as set forth in related Notification Law provisions,

. Cf. AS 25.20.025(a)(4) ("Except as prohibited under AS 18.16.010(a)(3)"' minors may give consent to pregnancy-related health care.).

, AS 18.16.020(a) (prohibiting, absent parental notice or other exception, persons from performing or inducing an abortion upon "a minor who is known ... to be pregnant, unmarried, under 18 years of age, and unemancipated"). *

. AS 18.16.020(b) provides in part:
An individual designated by the physician may initiate the notification process, but the actual notice shall be given by the physician, The physician giving notice of the abortion must document the notice or attempted notice in the minor's medical record and take reasonable steps to verify that the person to whom the notice is provided is the parent, legal guardian, or custodian of the minor seeking an abortion. Reasonable steps to provide notice must include
(1) if in person, requiring the person to show government-issued identification along *1131 with additional documentation of the person's relationship to the minor; additional documentation may include the minor's birth certificate or a court order of adoption, guardianship, or custodianship;
(2) if by telephone, initiating the call, attempting to verify through a review of published telephone directories that the number to be dialed is that of the minor's parent, legal guardian, or custodian, and asking questions of the person to verify that the person's relationship to the minor is that of parent, legal guardian, or custodian; when notice is attempted by telephone [but is unsuccessful, the physician -or designee] shall continue to initiate the call, in not less than two-hour increments, for not less than five attempts, in a 24-hour period.
AS 18.16.020(c) provides that if the attempts required under AS 18.16.020(b) are unsuccessful, then the physician:
may provide constructive notice to the mi-mor's parent, legal guardian, or custodian. Constructive notice is considered to have been given 48 hours after the certified notice is mailed. In this subsection, "constructive notice" means that notite of the abortion was provided in writing and mailed by certified mail, delivery restricted to addressee only, to the last known address of the parent, legal guardian, or custodian after taking reasonable steps to verify the mailing address.

. See AS 18.16.020(a)(1)(A)}-(B).

. AS 18.16.010(c) (providing fines of up to $1,000 and/or imprisonment up to five years); AS 18.16.010(e) (providing civil liability for compensatory and punitive damages to the minor and the minor's parents, guardian, or custodian).

. AS 18.16.010(g¢)(3) (defining "medical emergency" as "necessary to avert the minor's death" or when delay "will create serious risk of medical instability caused by a substantial and irreversible impairment of a major bodily function").

. See AS 18.16.030; AS 18.16.020(@)(4).

. AS 18.16.030(d), (@)(3).

. AS 18.16.030.

. AS 18.16.030(e), (8.

. AS 18.16.030(b)(4) provides that Vpermisbsion to bypass the notification requirement will be granted if the minor proves:
(A) that [she] is sufficiently mature and well enough informéd to decide intelligently whether to have an abortion without notice to ... a parent, guardian, or custodian; or
(B) that one or both of the minor's parents or the minor's guardian or custodian was engaged in physical abuse, sexual abuse, or a pattern of emotional abuse against the minor....

. AS 18.16,020(a)(4) allows minors who are victims of "physical abuse, sexual abuse, or a pattern of emotional abuse committed by one or both of the minor's parents or by a legal guardian or-custodian of the minor'"' to bypass notification by providing signed and notarized statements to the physician from the minor and from a witness with "personal knowledge" documenting the abuse. The witness must be a law enforcement officer, an Alaska Department of Health and Social Services representative who has investigated the abuse, or the minor's sibling over the age of 21, grandparent, or stepparent. No other witnesses are permitted. AS

. AS 18.16.020(d); see also AS 47.17.020; AS 47.17.290(6).

. Matanuska-Susitna Borough Sch. Dist. v. State, 931 P.2d 391, 397 (Alaska 1997) ("This court exercises its independent judgment in deciding equal protection claims.").

. State v. Schmidt, 323 P.3d 647, 655 (Alaska 2014) (quoting Alaska Civil Liberties Union v. State, 122 P.3d 781, 785 (Alaska 2005)).

. Id. (quoting State v. Anthony, 810 P.2d 155, 156-57 (Alaska 1991)).

. See Planned Parenthood II, 171 P.3d 577, 581 (Alaska 2007) (stating in context of constitutional challenge that "[wle review the superior court's factual determinations for clear error' (citing Grimm v. Wagoner, 77 P.3d 423, 427 (Alaska 2003))). The parties dispute whether we should review the superior court's findings of "constitutional" or "legislative" facts de novo or for clear error. Because we are not persuaded that the superior court's factual findings on which we rely would be erroneous under either standard, we do not need to address this dispute.

. Schmidt, 323 P.3d at 655 (quoting Alaska Civil Liberties Union, 122 P.3d at 785); see also Alaskans for a Common Language, Inc. v. Kritz, 170 P.3d 183, 192 (Alaska 2007).

. Planned Parenthood II, 171 P.3d at 581 (quoting Treacy v. Municipality of Anchorage, 91 P.3d 252, 260 n. 14 (Alaska 2004)); see also Haggblom v. City of Dillingham, 191 P.3d 991, 998 (Alaska 2008) ("We will not hold a statute void for vagueness if the statute has been shown to have a 'plainly legitimate sweep.'" (quoting Treacy, 91 P.3d at 260 n. 14)); Planned Parenthood I, 35 P.3d 30, 34-35 (Alaska 2001) (concluding that our previous standard-that a statute will be upheld unless there is "no set of circumstances . under which" it would be constitutional-is not a "rigid requirement" (quoting Javed v. State, Dep't of Pub. Safety, 921 P.2d 620, 625 (Alaska 1996))).
Even under the stricter "no set of cireumstances" analysis, only the effective applications of a statute authorizing or prohibiting conduct should be considered. Los Angeles v. Patel, - U.S. -, 135 S.Ct 2443, 2450-51, 192 LEd.2d 435 (2015). A law is measured for constitutional validity "by its impact on those whose conduct it affects," and the proper constitutional inquiry focuses on "the group for whom the law is a restriction, not the group for whom the law is irrelevant." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 894, 112 S.Ct. 2791, L.Ed.2d 674 (1992).

. See, eg., State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 912 (Alaska 2001) ("'Because [the regulation] infringes on a constitutionally protected interest, the State bears a high burden to justify the regulation."); Commercial Fisheries Entry Comm'n v. Apokedak, 606 P.2d 1255, 1261 (Alaska 1980) (noting strict scrutiny applies "when fundamental rights are at stake"); see also Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 762 A.2d 620, 633 (2000) (stating governmental burden on fundamental right "is deserving of the most exacting scrutiny").

. See Alaska Const. art. XH, § 5 (requiring public officers to swear to "support and defend ... the Constitution of the State of Alaska"); Malone v. Meekins, 650 P.2d 351, 356 (Alaska 1982) judicial branch ... has the constitutionally mandated duty. to ensure compliance with the provisions of the Alaska Constitution...."), quoted with approval in Planned Parenthood of Alaska, 28 P.3d at 913.

. Planned Parenthood II, 171 P.3d at 579 (footnote omitted) (quoting Planned Parenthood of Alaska, 28 P.3d at 906).

. See id. at 583-85.

. Id. at 579.

. Id. at 584.

. Id. (emphasis added).

. See generally id.

. Id. at 581 n. 21, 585 ("Because we conclude that the [Consent Act] violates the right to privacy under the Alaska Constitution, we need not address [whether] the Act also violates the equal protection clause_”).

. The concurring opinion’s conclusion that the Notification Law is unconstitutional under a privacy rights analysis should make this abundantly clear.

. Compare Alaska Const, art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed.”), and Ranney v. Whitewater Eng'g, 122 P.3d 214, 221 (Alaska 2005) ("The right of privacy protects ‘fundamental rights of personal autonomy’...." (quoting Sampson v. State, 31 P.3d 88, 94 (Alaska 2001))), with Alaska Const, art. I, § 1 ("[A]ll persons are equal and entitled to equal rights, opportunities, and protection under the law....”), and State, Dep’t of Health & Soc. Servs. v. Planned Parenthood of Alaska, 28 P.3d 904, 909 (Alaska 2001) ("Alaska’s constitutional equal protection clause ... protects Alaskans’ right to non-discriminatoiy treatment....”); also compare Ravin v. State, 537 P.2d 494, 504 (Alaska 1975) (fundamental rights analysis), with Titus v. State, Dep’t of Admin., Div. of Motor Vehicles, 305 P.3d 1271, 1278-79 (Alaska 2013) (equal protection analysis).

. 156 P.3d 1130 (Alaska 2007).

. Id. at 1131-36.

. -.56 P.3d 1046 (Alaska 2002).

. Id. at 1066 (concluding "subsection ,140(c)’s disparate treatment of minors under the age of eight is rationally based and furthers legitimate state interests”).

. Sands, 156 P.3d at 1133.

. Id. (alteration in original) (footnotes omitted).

. Planned Parenthood II, 171 P.3d 577, 581 n. 21, 583-86 (Alaska 2007).

. Id. at 581 n. 21, 585.

. State, Dep’t of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 909 (Alaska 2001) (quoting Alaska Pac. Assurance Co. v. Brown, 687 P.2d 264, 271 (Alaska 1984)).

. Pub. Emps, Ret. Sys. v. Gallant, 153 P.3d 346, 349 (Alaska 2007) (emphasis added) (footnotes omitted). Similarly see Stanek v. Kenai Peninsula Borough, 81 P.3d 268, 270-71 (Alaska 2003) (quoting extensively from Gonzales v. Safeway Stores, Inc., 882 P.2d 389, 396 (Alaska 1994)) explaining that we view statutory enactment with differential treatment as creating separate groups and that we ask whether such classification has sufficient government justification under the appropriate level of scrutiny.

. State v. Schmidt, 323 P.3d 647, 660 (Alaska 2014).

. Id. at 659 (citing Alaska Civil Liberties Union v. State, 122 P.3d 781, 788 (Alaska 2005); Alaska Inter-Tribal Council v. State, 110 P.3d 947, 956 (Alaska 2005)). "When a- ‘law by its own terms *1136 classifies persons for different treatment," the law is facially discriminatory." Id. (quoting Alaska Civil Liberties Union, 122 P.3d at 788).

. See AS 18.16.020(a).

. See, eg., Gallant, 153 P.3d at 351-55 (applying independent judgment); Stanek, 81 P.3d at 269-71 (applying independent judgment); Gonzales, 882 P.2d at 396-99 (applying independent judgment).

. 110 P.3d at 947.

. Id. at 966.

. Id. at 967 (citing Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001). We ultimately concluded, in part, that the superi- or court's findings of fact about the various geographical locations "show that the superior court did not clearly err in finding that the two asserted similarities are not the relevant, much less the only relevant, points of comparison for determining the issue of similarly-situatedness." Id. at 969 (emphasis in original).

. 273 F.3d at 499. Although we do not need to delve into the matter now, a close reading of this case suggests that the federal court actually may have applied a mixed question of fact and law analysis, looking to the trial court's factual determinations about business locations and then applying independent judgment to whether, given the facts found by the trial court, the zoning board had a rational basis for its decision. Compare id. at n. 2 and at 500-02. This would be consistent with the legal framework we use today.

. 882 P.2d at 396.

. 81 P.3d 268, 270-71 (Alaska 2003).

. 153 P.3d 346, 349-54 (Alaska 2007).

. 110 P.3d at 967. We will summarily conclude that two classes are not similarly situated only in clear cases because "[s]uch a conclusion reflects in shorthand the analysis traditionally used in our equal protection jurisprudence." Shepherd v. State, Dep't of Fish & Game, 897 P.2d 33, 44 n. 12 (Alaska 1995). But see id. at 46 (Rabinowitz, J., concurring) (arguing that the shorthand analysis "inadequately analyzes the issue in this case" and "simply begs the question of whether the classification itself is reasonable and whether it justifies disparate treatment").
State v. Schmidt, 323 P.3d 647 (Alaska 2014), reflects a somewhat mixed approach. Schmidt involved a property tax exemption scheme for certain married property owners. Id. at 651-53. Same-sex couples then-barred under Alaska law from marrying raised an equal protection chal *1137 lenge. Id. at 653-54. We first cited Alaska Inter-Tribal Council for the proposition that "similarly situated" generally is a question of fact. Id. at 655. We examined as a threshold matter whether committed same-sex couples who wanted (but were prohibited by law) to marry were similarly situated to opposite-sex couples who wanted to marry. Id. at 660-61. But rather than resolving the "similarly situated" issue purely as a factual matter reviewed for clear error, or even through a shorthand analysis of "similarly situated" as a factual matter reviewed for clear error, we considered the superior court's factual findings about the similarities of long-term commitments by same-sex domestic partners and married couples and held as a matter of law that same-sex couples who would marry if allowed to do so were-for purposes of the tax exemption program-similarly situated to married cquples. Id. at 661. We then undertook the usual equal protection analysis to determine whether discrimination between married couples and same-sex couples could be justified under the government interests raised to support the tax exemption scheme. Id. at 662-64.

. Alaska Pac. Assurance Co. v. Brown, 687 P.2d 264, 269-70 (Alaska 1984).

. Valley Hosp. Ass'n v. Mat-Su Coal. for Choice, 948 P.2d 963, 968-69 (Alaska 1997) (establishing fundamental privacy right for pregnant women); *1138 Planned Parenthood I, 35 P.3d 30, 40-41 (Alaska 2001) (extending fundamental privacy right to pregnant minors).

. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 909 (Alaska 2001) ('The regulation at issue in this case affects the exercise of a constitutional right, the right to reproductive freedom. Therefore, the regulation is subject to the most searching judicial scrutiny, often called 'strict serutiny,' " (footnote omitted)). We reject the Sponsors' argument that the State only needs to advance a rational basis for treating the two groups of pregnant minors differently because those seeking termination are a "nonsuspect classification."

, Treacy v. Municipality of Anchorage, 91 P.3d 252, 266 (Alaska 2004).

. Id. (quoting Nunez ex rel. Nunez v. City of San Diego, 114 F.3d 935, 946 (9th Cir. 1997).

. State, Dep't of Revenue, Permanent Fund Dividend Div. v, Cosio, 858 P.2d 621, 629 (Alaska 1993) (alteration in original) (quoting State v. Ostrosky, 667 P.2d 1184, 1193 (Alaska 1983)).

, A governmental interest must be more than legitimate to be "compelling." To prove an interest compelling in the equal protection' context, the State must show that the interest actually needs to be vindicated because it is significantly impaired at present. See, eg., Vogler v. Miller, 651 P.2d 1, 5-6 (Alaska 1982); Gray v. State, 525 P.2d 524, 528 (Alaska 1974); Breese v. Smith, 501 P.2d 159, 172 (Alaska 1972).
Although we cite cases discussing the word "compelling" in the fundamental privacy rights context, the meaning of "compelling" as an adjective is the same in the equal protection con'text. Where our fundamental privacy rights and equal protection analyses differ is in the necessary justification: In the fundamental privacy rights context, the compelling interest must be important enough to justify infringing on a right, but in the equal protection context, the compelling interest must be important enough to justify treating two classes differently regarding such a right. See supra note 59 and accompanying text.

. In Planned Parenthood II the State asserted that the Consent Act served five governmental interests; "(1) ensure that minors make an informed® decision on whether to terminate a pregnancy; (2) protect minors from their own immaturity; (3) protect minors' physical and psychological health; (4) protect minors from sexual abuse; and (5) strengthen the parent-child relationship." 171 P.3d 577, 582 n. 29 (Alaska 2007). We grouped these interests into the "generalized" interests of "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities." Id. at 582.
Here the Staite asserts that its interest in protecting minors from their own immaturity includes ensuring that they use "moral imagination" in making their decisions. We assume the State is not implying that minors seeking to terminate a pregnancy are more lacking in "moral imagination" than those seeking to carry to term or that one decision is more or less ethical than the other, but rather is simply asserting that minors' inability to fully appreciate ethical concerns puts their physical, psychological, and/or sexual health at greater risk such that they are in need of more protection. Cf. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 905 (Alaska 2001) ("Alone among - Medicaid-eligible Alaskans, women whose health is endangered by pregnancy are denied health *1139 care based solely on political disapproval of the medically necessary.-procedure. This selective denial of medical benefits violates Alaska's constitutional guarantee of equal protection."); Valley Hosp,. Ass'n v. Mat-Su Coal. for Choice, 948 P.2d 963, 971 (Alaska 1997) {concluding "matter of conscience" not a compelling governmental interest); Ravin v State, 537 P.2d 494, 509 (Alaska 1975) (''The state cannot impose its own riotions of morality, propriety, or fashion on individuals. ..."). The State expressly stated at oral argument that it has no interest, compelling or otherwise, in affecting a pregnant minor's 'ultimate reproductive choice.

. Planned Parenthood II, 171 P.3d at 579.

. Id. at 582.

, Id. (emphasis added).

. Sze supra note 89.

. Schiel v. Union Oil Co. of Cal., 219 P.3d 1025 1030 (Alaska 2009).

. See State v. Ostrosky, 667 P.2d 1184, 1193 (Alaska 1983) ("As the level of scrutiny selected is higher ... we require that ... the legislation's means-to- ends fit be comespondlngly closer. On ' the other hand, if relaxed scrutiny is indicated, .. a greater degree of over[inclusiveness Jor underinclusiveness in the means-to-ends fit will - be tolerated,").

, We disagree with the dissent's contention that the issue before us is about parents' constitutional rights to parent their children, rather than the State's restriction of fundamental privacy rights in violation of the Alaska Constitution's equal protection guarantee, This appeal does not arise from a suit to enjoin the State from interfering with a parent's constitutional rights as a parent, This appeal arises from a suit to enjoin the State from restricting a minor's constitutional and statutory rights to pregnancy-related health care based solely on that minor's exercise of her fundamental privacy right to reproductive choice.

. Planned Parenthood II, 171 P.3d at 583 (quoting H.L. v. Matheson, 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981)).

. Id. (quoting Wisconsin v. Yoder, 406 U.S. 205, 233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

. Id. (first alteration in original) (quoting Bellotti v. Baird, 443 U.S. 622, 639, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979)).

. The dissent-alone-asserts that unequal treatment is warranted solely by the moral difference in the pregnant minors' choices: "What similarity can there be between a decision to terminate life and a decision to preserve life?" Dissent at 1158. This moral distinction is unsupported by any asserted State interest justifying the Notification Law, and it can lead only to a conclusion that the "wrong choice" launches a pregnant minor into a category of dissimilarity subjecting her to greater governmental interference than a pregnant minor who makes the "right choice." It is telling that the dissent's objection to interference with parental rights to participate in a minor's pregnancy-related health care is limited to the right to counsel against an abortion, and does not include the right to counsel against the more medically dangerous decision to carry to term.

. The State also argues that there is no opportunity to notify parents when minors choose to carry to term. See AS 25.20.025(a)(4) (permitting minors to receive medical treatment related to the "diagnosis, prevention, or treatment of pregnancy" without parental consent). But physicians could be statutorily required to notify parents: of minors seeking any pregnancy-related medical care, just as the Notification Law requires notifying parents of minors seeking pregnancy termination. The relative wisdom of such a requirement, of course, is within the legislature's province, not ours, and we express no opinion whether such a requirement would survive a privacy-based constitutional challenge.

. The Sponsors argued in their briefing that carrying a child to term is not a choice because it is the natural result of pregnancy absent a decision to terminate. But at oral argument the Sponsors conceded that the mutually exclusive decision faced by a pregnant minor is carrying to term or termination. Cf. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 913 (Alaska 2001) ("[A] woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice."),

. See also Gonzales v. Carhart, 550 U.S. 124, 183 n. 7, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (Ginsburg, J., dissenting) ("[NJeither the weight of the scientific evidence to date nor the observable reality of 33 years of legal abortion in the United States comports with the idea that having an abortion is any more dangerous to a woman's long-term mental health than delivering and parenting a child that she did not intend to have...." (quoting Susan A. Cohen, Abortion and Mental Health: Myths and Realities, 9 Gurtmacher Pol'y Rev. 8 (2006); City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 429 n. 11, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) ('There is substantial evidence that developments in the past decade, particularly the development of a much safer method for performing second-trimester abortions ... have extended the period in which abortions are safer than childbirth." (emphasis added)), overruled on other grounds by Planned Parenthood of Se. Pa. v. Ca sey, 505 U.S. 833, 882, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); Beal v. Doe, 432 U.S. 438, 445, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (accepting assertion that "an early abortion poses less of a risk to the woman's health than childbirth"); Roe v. Wade, 410 U.S. 113, 149, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ("Mortality rates for women undergoing early abortions, where the procedure is legal, appear to be as low as or lower than rates for normal childbirth."); Isaacson v. Horne, 716 F.3d 1213, 1224 (9th Cir. 2013) ('The Supreme Court has recognized that'... improvements in medical technology will ... push later in pregnancy the point at which abortion is safer than childbirth. ..."); cf. Casey, 505 U.S. at 860, 112 S.Ct. 2791 ("'We have seen how time has overtaken some of Roe's factual assumptions: advances in maternal health care allow for abortions safe to the mother later in pregnancy..."). **

. In fact, the implication of the State's argu'ment is that parental notification hinders the State's interest in protecting minors' health by discouraging and potentially delaying them from obtaining constitutionally protected medical treatment. If there is no medically or psychologically inferred difference between pregnant minors making reproductive choices, and if the State has no interest in which reproductive choice is made, under its own theory the Notification Law is detrimental to the State's compelling interest in protecting the health of minors seeking termination, -

. See AS 18.16.010(a)(1) ("An abortion may not be performed in this state unless ... by a physician. ..,"). + t.

, Cf. Planned Parenthood of Alaska, Inc., 28 P.3d at 913 ("[A] woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice.").

. As evidenced by the multitude of illicit abortions performed in this country before Roe v. Wade, restrictive abortion laws do not guarantee compliance. Sée 410 U.S. 113, 150, 93 S.Ct. 705, 35 LEd.2d 147 (1973) (recognizing "high mortality rates at illegal 'abortion mills' ").

. Even were we to assume that reporting sexual abuse is correlated with maturity, we note that the superior court did not find that minors seeking termination were less mature than minors seeking to carry to term. To the contrary, the court noted that minors seeking termination may in some ways be more mature than those seeking _ to carry to term, including being more likely to have "high educational accomplishments or aspirations a greater ability to conceptualize the future, and a greater sense of control over their lives." The State and the Sponsors appeal this point, but they offer no evidence showing that pregnant minors seeking termination are less mature than those seeking to carry to term.

. We make another observation about the dissent, which-unlike all of the parties-contends that the Notification Law is not a real barrier to a mature minor's ability to obtain the medical care necessary to terminate a pregnancy. The dissent argues 'that as a practical matter the Notification Law is not a barrief to abortion access because: (1) only one parent has to be notified; (2) there is an exception for the protection of the minor's life; and (3) the "easily navi- . gable" judicial bypass mechanism presents "an almost negligible hurdle." Dissent at 1159-60, The obvious counter-argument would be that if the Notification Law really is not a barrier to medical treatment for a minor seeking to terminate a pregnancy, it really would not be a barrier to a minor seeking to carry to term, Yet the dissent acknowledges that for a minor seeking to carry to term, parental notification would be a potential barrier to access to prenatal care. It is virtually undisputed that a minor's access to any kind of pregnancy-related health care is burdened by parental involvement-there otherwise would be no need for medical emancipation statutes, The question here is whether-given its stated justifications-the State constitutionally can burden:access to only that pregnancy-related miedical care related to terminating a pregnancy.

. See generally Planned Pdrenthood of Cent. N.J. v. Farmer, 165 N.J..609, 762 A.2d 620 (2000) (considering law requiring parental notifidation or judicial waiver before minor could obtain abortion).

. Id. at 631-33; see also Planned Parenthood II, 171 P.3d 577, 581 (Alaska 2007) ('Because [Alaska's constitutionally protected] right to privacy is explicit, its protections are necessarily more robust and 'broader in scope' than those of the implied federal right to privacy." (quoting Ravin v. State, 537 P.2d 494, 515 (Alaska 1975) (Boochever, J., concurring))).

. Farmer, 762 A.2d at 633.

. Id. at 636.

. Id.. at 636-39. The court noted evidence that cesarean sections, which did not have a parenial . notification. requirement, were more dangerous for pregnant minors than were abortions and that minors seeking terminations for the most part were not immature. Id. at 636-37.

. Id. at 638.

, Id. at 622.

. We reiterate that our decision today is based on the limited State interests raised as the Notification Law's justification. The dissent criticizes that we have not identified exactly what is wrong with the Notification Law's language and that our decision means no notification law can ever be worded to pass equal protection muster in Alaska. Our response-again-is that the Notification Law's problem is not with wording, but rather with the lack of an acceptable justification for discriminating between pregnant minors based on how they exercise their fundamental privacy right to reproductive choice: The equal protection clause guarantees that the State may not discriminate between individuals with respect to a fundamental right unless a compelling governmental interest justifies the discrimination. See supra note 59 and accompanying text.

. 505 U.S. 833, 112 S.Ct. 2791, 120 LEd.2d 674 (1992).

. Dissent at 1155.

. Dissent at 1155.

. 505 U.S. at 869-79, 112 S.Ct. 2791.

. Any balancing-under the Alaska Constitution-of a woman's fundamental privacy right of" reproductive choice and a hypothetical government interest in limiting abortions and preserving unborn life is not before us. To avoid any future misunderstanding, we note that our Casey discussion here is not intended to be an explicit or implicit approval or disapproval of any position on such an abstract question.

. Given the dissent's viewpoint on the morality of abortion and its emphasis on parents' constitutional rights to instill moral standards and religious beliefs in their children, the dissent apparently presumes, without regard to any of the stated justifications for the Notification Law, that parents would follow the dissent's moral code and try to persuade their pregnant daughters not to have abortions. Some probably would. Some probably would not. Casey itself is instructive in this regard:
Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code.
505 U.S. at 849, 112 S.Ct. 2791.

. Cf. Planned Parenthood II, 171 P.3d 577, 581 n, 21 (Alaska 2007) (declining to address equal protection claim after holding law unconstitutional on privacy grounds); State, Dep't of Health ' &Soc. Servs. v. Valley Hosp. Ass'n, 116 P.3d 580, 584 (Alaska 2005) (noting court has a "practice of reaching constitutional issues only when the case cannot be fairly decided on statutory or other grounds" (citing Kenai Peninsula Fisherman's Coop. Ass'n v. State, 628 P.2d 897, 908 (Alaska 1981))). OC

. State v. Planned Parenthood of Alaska (Planned Parenthood ID, 171 P.3d 577, 582 (Alaska 2007).

. Valley Hasp, Ass’n v. Mat-Su Coalition For Choice, 948 P.2d 963, 969 (Alaska 1997).

. See Planned Parenthood II, 171 P.3d at 581 n. 21 (“Because we conclude that the [Parental Consent Act] violates the right to privacy under tire Alaska Constitution, we need not address the plaintiffs' arguments that, the Act also violates the equal protection clause or that the superior court erred in interpreting the Act to include a medical emergency exception.”); State v. Planned Parenthood of Alaska (Planned Parenthood I), 35 P.3d 30) 41, 45 (Alaska 2001) (holding that "[t]o justify the [Parental Consent Act's] restriction of a minor’s right to terminate a pregnancy, ... the state must establish a compelling interest in restricting the minor’s right to privacy" and declining to decide the equal protection question until further evidentiary hearings were held); Valley Hosp,, 948 P.2d at 969 (explaining that "reproductive rights are ... encompassed within the right to privacy expressed in ,.. the Alaska- Constitution”). But see State, Dep’t of Health & Soc. Servs. v. Planned Parenthood of Alaska, 28 P.3d 904, 908-13 (Alaska 2001) (applying equal protection analysis in striking down a statute that denied Medicaid funding for medically necessary abortions).

. See, e.g,, Planned Parenthood II, 171 P.3d at 581 (fundamental right to. privacy); Titus v. State, Dep’t of Admin., Div. of Motor Vehicles, 305 P.3d 1271, 1278 (Alaska 2013) (equal protection).

. Planned Parenthood II, 171 P.3d at 582.

. Pub. Emps. Ret. Sys. v. Gallant, 153 P.3d 346, 349 (Alaska 2007).

. See AS 25,20.025.

. AS 25.20.025(a)(4).

. See AS 18.16.010(a) ("An abortion may not be performed in this state unless ... by a physician . in a hospital or other facility approved for the purpose.").

. See State, Dep't of Health &Soc. Servs. v. Planned Parenthood of Alaska, 28 P.3d 904, 913 (Alaska 2001).

. 171 P.3d 577, 579 (Alaska 2007).

. Although the parties raised the equal protection question in that case, we determined that we did not need to reach it. See id. at 581 n. 21. But by explaining that "the constitution permits" a parental notification law, we strongly suggested that such a law might pass constitutional muster more broadly, as long as it struck "the proper constitutional balance between the State's compelling interests and a minor's fundamental right to privacy." Id. at 579.

. See id. at 583 n. 40; Daur, Cops Ann. tit, 24, § 1783 (2015); Fra. Sram § 390.01114 (2015); Ga. Copr Ann. § 15-11-682 (2015); 750 Iru. Comp. Srar 70/15 (2015); Iowa Copm § 135L.3 (2015); Mo. Cop® Ann., § 20-103 (West 2015); Minx, Star. § 144.343 (2015); NH. Rev. Stat. Any. § 132:33 (2015); S.D. Coptrten Laws § 34-2347 *1148 (2015); W. Va. Cope § 16-2F-3 (2015); see also Coro. Rev. Sra. § 12-37.5-104 (2015), invalidated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens, 287 F.3d 910 (10th Cir. 2002) (holding the statute unconstitutional because it failed to include an exception for the health of the pregnant minor).

. See Alaska Const. art. I, § 22 ('The right of the people to privacy is recognized and shall not be infringed.").

. See Planned Parenthood II, 171 P.3d at 581-82.

, Id. at 582.

. See id. at 583.

, Id. at 579.

. Id. at 584.

. This reference to parental consent appears to be an anomaly in the statute, in which parental notice otherwise replaced parental consent.

. AS 18.16.030(b)(4)(A)-(B).

. AS

. See Fua Stat. § 390.01114(4)(c); S.D. Copiriep Laws § 34-23A-7; see also Coro. Rev. Stat, § 12-37.5-107(2)(a), invalidated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens, 287 F.3d 910 (10th Cir. 2002).

. See Fua Stat. § 390.01114(4)(d); S.D. Conriep Laws § 34-23A-7. Florida has a separate abuse ground for bypass that need only be proved by a *1149 preponderance of the evidence, limiting the severity of this standard of proof for the best interest analysis. See Fra. Strat. § 390.01114(4)(d).

. See Fra. Stat. § 390.01114(4)(d) (no notice required if court finds abuse by preponderance of the evidence); 750 In Comp. Stat. 70/20(4) (no notice required if minor declares abuse or neglect to physician in writing); Iowa Cone ~ § 135L.3(3)(m)(4)-(5) (no notice required if minor declares abuse to physician and it has been previously reported to authorities); 'Mp. Copz Ann., Heartz-Gzex. § 20-103(c)(1)@) (no notice required if physician judges that notice may lead to abuse); Minn. Strat. § 144.343(4)(c) (mo notice required if minor declares abuse or neglect to physician, who must then report abuse); see also Coro. Rev. Stat. § 12-37.5-105(1)(b) (no notice - required if minor declares abuse or neglect.to physician), invalidated by Planned Parenthood of the Rocky Mountains Servs., 287 F.3d 910.

. Evans v. McTaggart, 88 P.3d 1078, 1095 (Alaska 2004) (Fabe, C.J., dissenting).

. AS 18.16.030(b)(4)(B), (©.

. Evans, 88 P.3d at 1097 (Fabe, C.J., dissenting). . a,

. Id.

. AS 18.16.020(a)(4).

. As the superior court explained, witnesses at trial testified that the opportunity for exemption by means of a witnessed affidavit is "largely illusory" because it requires the minor to disclose her pregnancy to a family member who witnessed the abuse but "who has to that moment remained silent." And as the superior court recognized, "[it is unlikely that an adolescent would recall the name of an OCS worker or a police officer who was involved with the family at a prior time, or will desire to reveal her pregnancy to such a stranger." Therefore, the superior court concluded, "only a small percentage of abuse victims will avail themselves of the [law's] affidavit-of-abuse exception to notice."

. 171 P.3d 577, 584 (Alaska 2007).

. See Ga. Copg Amn. §§ 15-11-681(2); 15-11-682(a)(1)(A).

. See Fis Smit. § 390.01114(3)(@).

. AS 18.16.020(b)(1).

. AS 18.16.020(b)(‘2).

. AS 18.16.020(b). The State and its co-appel- ' lants do not appeal the superior court's injunction against the law's requirement that the physician personally deliver notice in all cases, but we nonetheless review this provision in reviewing the constitutionality of the statute as a whole.

. See Dr.. Cope Ann. tit. 24, § 1783(1) (notice may be provided by, among others, an agent of the physician); Ga. Cope Awn. § 15-11-682(a)(1)(B) (notice may be provided by the physician's qualified agent); 750 Im.. Comp. Stat. 70/15 (notice may be provided by the physician's agent); Minn. Stat. § 144.343(2)(a) (same); NH. Rev, Strat. Ann. § 132;:33(II) (same); S.D. Coptrigp Laws § 34-23A-7 (same); W. Va. Copp § 16-2F-3(a) (requirement met if "physician has given [notice] or caused [notice] to be given"); see also Coro. Rev. Strat. § 12-37,5-104(1)(a) (notice may be provided by, among others, any person older than 18 who is not related to the minor), fnvali-dated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens, 287 F.3d 910 (10th Cir. 2002).

. See S.D. Conirirn Laws § 34-23A-22; see also Coro. Rev. Strat. § 1237.5-106(1), invalidated by Planned Parenthood of the Rocky Mountains Servs., 287 F.3d 910.

. See Det. Copg Aun. tit, 24, § 1789B; see also Minx. Star. § 144.343(5) (establishing civil Hability but not damages); NH. Rev, Srat Aww. § 132:35 (same).

. See AS 18.16.010(e).

. See AS 18.16.010(c).

. See Fra. Stat. § 390:.01114; 750 Iut. Comp. Stat. 70/40 (no criminal penalty for physicians, misdemeanor for unauthorized signing of waiver of notice); Mo. Cop® Anx., Hearte-Gzan. § 20-103 (no criminal penalty for physicians); see also Coro. Rav, Srat. § 12~37.5-106, invalidated by Planned Parenthood of the Rocky Mountains Servs., 287 F.3d 910.

. See Der. Cope Ann. tit. 24, § 1789; Ga. Copr Ann, § 15-11~-688; Iowa Copr § 135L.3(3)(n); Mmm. Stat § 144.343(5); N,H. Rev. Star Ans. § 132:35; W. Va. Coon § 16—2F—8

, See SD. Contemp Laws §§ 22-17-5, 2-6-1,

. Ste AS 18:16.020(c). Although the superior court construed the statute to avoid these two particular problems, their inclusion in the original statutory text provides yet another indication . that the Jaw as enacted did not use the least restrictive means available.

. See Planned Parenthood II, 171 P.3d 577, 583 (Alaska 2007).

. Id.

. Id. at 587 (Carpeneti, J., dissenting).

. See AS 25.20.025(a)(1) ("[A]) minor who is living apart from the minor's parents or legal guardian and who is managing the minor's own financial affairs, regardless of the source or extent of income, may give consent for medical and dental services.").

. AS 18.16.010(a)(3) (parental notification law applies to all "pregnant, unmarried, unemanci-pated wom{[eln under 18 years of age"); AS 09.55.5990 (establishing judicial process by which a minor can be emancipated).

. State v. Alaska Civil Liberties Union, 978 P.2d 597, 633 (Alaska 1999).

. Alaskans for a Common Language, Inc. v. Kritz, 170 P.3d 183, 209 (Alaska 2007) (quoting Lynden Transp., Inc. v. State, 532 P.2d 700, 713 (Alaska 1975)).

. Id. at 209-10.

. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 330, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting Califano v. Westcott, 443 U.S. 76, 94, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979)) (Powell, J., concurring in part and dissenting in part).

. Alaskans for a Common Language, 170 P.3d at 209 (quoting Alaska Civil Liberties Union, 978 P.2d at 633).

. E.g., Ayotte, 546 U.S. at 331, 126 S.Ct. 961 (allowing certain portions of the challenged law to stand in part because "the Act contains a severability clause"); Ruiz v. Hull, 191 Ariz. 441, 957 P.2d 984, 1002 (1998) ("[Wle decline to sever the invalid portions of the Amendment ... because [it] does not contain a severability clause and ... because the record is devoid of evidence that the voters would have enacted such a rewritten and essentially meaningless amendment."); Dallman v. Ritter, 225 P.3d 610, 638 (Colo. 2010) (holding that, when assessing "the autonomy of the portions remaining" and "the intent of the enacting legislative body," the court "must take into account any severability clause, which dem *1153 onstrates the lawmaking body's intent that the law remain largely in force despite particular, limited infirmities").

. Planned Parenthood II, 171 P.3d 577 (Alaska 2007); Planned Parenthood I, 35 P.3d 30 (Alaska 2001).

. See, eg., Spokane Arcades, Inc. v. Brockett, 631 F.2d 135, 139 (9th Cir. 1980), aff'd, 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981) (holding that the entire statute must fall despite the inclusion of a severability clause).

. Alaskans for a Common Language, 170 P.3d at 212 (quoting Sonneman v. Hickel, 836 P.2d 936, 941 (Alaska 1992)).

. Id.

. Lynden Transp., Inc. v. State, 532 P.2d 700, 713 (Alaska 1975).

. Spokane Arcades, Inc., 631 F.2d at 139 (internal alterations omitted) (quoting Sloan v. Lemon, 413 U.S. 825, 834, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973)).

. Id.

. Dallman v. Ritter, 225 P.3d 610, 616-17; 638—40 (Colo. 2010).

. Id. at 639 (alterations omitted) (quoting City of Lakewood v. Colfax Unlimited Ass'n, 634 P.2d 52, 69 (Colo. 1981)).

. Id. (citing Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006)).

, Id. (citing City of Lakewood, 634 P.2d at 70).

. AS 18.16.020(a)(1)-(4).

. See Spokane Arcades, Inc. v. Brockett, 631 F.2d 135, 139 (Oth Cir, 1980), aff'd, 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981).

. See, eg., State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co., 262 P.3d 593, 598 (Alaska 2011) (declining to alter the meaning of a statute even when it was likely misdrafted).

. Ayotte, 546 U.S. at 329-30, 126 S.Ct. 961 (noting that, when deciding whether to sever a portion of a statute, courts should refrain from rewriting the law in question); Ruiz v, Hull, 191 Ariz. 441, 957 P.2d 984, 1002 (Ariz. 1998) (declining to perform "judicial surgery" because it would leave a "rewritten and essentially meaningless [law]"); Dallman, 225 P.3d at 638 ("[Wle cannot rewrite or actively reshape a law in order 'to maintain its constitutionality," (citing Ayotte, 546 U.S. at 330, 126 S.Ct. 961)).

. Dissent at 1165-66.

. Ayotte, 546 U.S. at 329, 126 S.Ct. 961 (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)).